UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


- - -

UNITED STATES OF AMERICA,      . CASE NO. 1:14-cr-086
                               .
                Plaintiff,     .
                               . *ARRAIGNMENT and PLEA*
     - vs -                    .
                               . Tuesday, September 23, 2014
JOHN R. BULLAR,                .
                               . 1:55 p.m.
                Defendant.     . Cincinnati, Ohio
. . . . . . . . . . . . . . .  .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHAEL R. BARRETT


APPEARANCES

For the Plaintiff:

EMILY N. GLATFELTER, ESQ.(AUSA)
United States Attorney's Office
221 East Fourth Street, Suite 400
Cincinnati, Ohio  45202


For the Defendant:

CANDACE C. CROUSE, ESQ.
Pinales Stachler Young & Crouse
455 Delta Avenue, Suite 105
Cincinnati, Ohio  45226


Also Present:      Laurie Cooke, Pretrial Services Officer
                   I.R.S. Agent Gordon Amegboh

Courtroom Deputy:  Mary Brown

Court Reporter:    Maryann T. Maffia, RDR

1          P R O C E E D I N G S

2          COURTROOM DEPUTY:  Case Number CR-1-14-86:  *United*

3    *States of America versus John Bullar.*

4          THE COURT:  Okay.  Counsel want to enter their

5    appearances for the record, please.

6          MS. GLATFELTER:  Emily Glatfelter for the United

7    States, and I'm joined at counsel table by Gordan Amegboh from

8    the IRS.

9          MS. CROUSE:  Candace Crouse on behalf of John Bullar.

10         THE COURT:  Okay.

11     John, we know each other; right?

12         THE DEFENDANT:  Yes, sir, we do.

13         THE COURT:  And we now know that's a turn-only lane.

14         THE DEFENDANT:  Right.

15         THE COURT:  Anyway, everything got taken care of, so

16   it doesn't cause me any heartburn if it doesn't cause you any.

17         THE DEFENDANT:  It does not.  I'm glad it was taken

18   care of, Your Honor.

19         THE COURT:  Okay.  All right.

20     It's my understanding that the intent of counsel today is

21   to proceed with a two-count Information.  The first count

22   would be Wire Fraud, a violation of 18 U.S.C. 1343; and the

23   second count would be Engaging in Monetary Transactions

24   Derived from Specified Unlawful Activity, and that would be

25   18 U.S.C. 1957.

1    Are we all on the same page on that, counsel?

2        MS. GLATFELTER:  Yes, Your Honor.

3        MS. CROUSE:  Yes, Your Honor.

4        THE COURT:  All right.

5    John, the elements of the offense of Wire Fraud, which

6 would be the 18 U.S.C. 1343, are that you devised a scheme to

7 defraud in order to obtain money or property, that is, to

8 defraud investors to obtain money and property by use of false

9 or fraudulent pretenses, representations and promises; that

10 there were material misrepresentations made or concealment of

11 material facts; that there was intent to defraud; and that you

12 used or caused another to use communications in interstate

13 commerce in furtherance of that scheme; and that at least part

14 of that scheme occurred in the Southern District of Ohio.

15    The second count, which is 18 U.S.C. 1957, is that you

16 knowingly engaged in a monetary transaction; there was money

17 that was derived from the specified unlawful activity; that

18 this particular money was more than $10,000; that you knew

19 that the money involved in the transaction was derived from

20 the criminal activity; and, again, that all occurred in the

21 Southern District of Ohio.

22    So you're aware that those are the charges; is that

23 correct?

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT:  Okay.  All right.  I'm going to have to

1   ask you a number of questions just to make sure that you

2   understand what we're doing here today.  In order to do that,

3   you're going to be put under oath.  All right?

4          THE DEFENDANT:  Uh, huh.

5          THE COURT:  That means if you were to say something

6   to me that was a material misrepresentation, the prosecution

7   could actually charge you with perjury.  But there's no trick

8   questions.  What I'm going to ask you about are your

9   understanding of what's going on and also the rights that

10  you're intending to give up by proceeding, first of all, by

11  Information, and then also by way of plea.  Is that fair

12  enough?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Could you swear him, please.

15         COURTROOM DEPUTY:  Please raise your right hand.

16     (The courtroom deputy administered the oath.)

17         THE DEFENDANT:  I do.

18         THE COURT:  Okay.  John, your middle initial is R; is

19  that correct?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  And what's that stand for?

22         THE DEFENDANT:  Raymond.

23         THE COURT:  Raymond.  And where did you grow up?

24         THE DEFENDANT:  Worthington, Ohio.

25         THE COURT:  Worthington, Ohio.  How old are you now?

1          THE DEFENDANT:  Fifty-two.

2          THE COURT:  Okay.  And what type of formal -- this

3     has to do with your ability to understand the Information, the

4     charge and the agreement.  Tell me a little bit about your

5     highest level of education.

6          THE DEFENDANT:  I received a Bachelor of Arts from

7     Wilmington College, just up the road, in 1984.

8          THE COURT:  Okay.

9          THE DEFENDANT:  I did attend Xavier University for

10    some graduate classes, did not finish that degree as I went on

11    to work.

12         THE COURT:  Okay.  We have a couple of documents.

13    One is the Waiver of Indictment and your election to proceed

14    by Information.  The other is the actual Plea Agreement that's

15    been arrived at as a result of discussions with your attorney

16    and the government.  Have you read all of those documents?

17         THE DEFENDANT:  Yes, sir, Your Honor.

18         THE COURT:  Are you able to understand the language

19    in those documents?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  If you had any questions about either the

22    legalese or what might come as a result of those documents,

23    did you discuss those with Miss Crouse?

24         THE DEFENDANT:  I did, Your Honor.

25         THE COURT:  Did she satisfactorily answer those

1    questions?

2         THE DEFENDANT:  She did, Your Honor.

3         THE COURT:  Okay.  Now, this other question also

4    deals with your mental capacity at this time, which is:  Have

5    you ever --

6        It's a long, involved, sort of tongue-twister question

7    which basically means is your head in the ball game.

8        Have you ever been treated for any mental illness or

9    substance addictions such that either the presence of a

10   current condition or the effect of a prior condition or

11   current treatment makes it difficult for you to understand the

12   questions that I'm asking you today in court or the

13   conversations you've had with your lawyer?

14        THE DEFENDANT:  No, Your Honor.

15        THE COURT:  Okay.  You're out on bond, so let me ask

16   you:  Have you had any kind of narcotics, medication, pills,

17   whether prescription or otherwise, or alcoholic beverages in

18   the last 24 hours that affects your ability to understand the

19   proceeding we're engaged in today?

20        THE DEFENDANT:  No, Your Honor.

21        THE COURT:  All right.

22        Candace, you have had a number of conversations with your

23   client.  Do you have any doubt as to his ability to understand

24   what we're doing and his competence to engage in the legal

25   process at this point?

1       MS. CROUSE:  I have no doubt, Your Honor.  I do

2  believe he is competent today.

3       THE COURT:  Okay.

4    John, do you believe double that Miss Crouse has fully

5  explained to you the import and ramifications of both Count

6  One and Count Two?

7       THE DEFENDANT:  Yes, sir, I do.

8       THE COURT:  And do you think that she has fully

9  informed you about the facts and circumstances on which the

10  government has based these charges and the type of evidence

11  the government would use had you elected to proceed to trial

12  on this?

13       THE DEFENDANT:  Yes, she has, Your Honor.

14       THE COURT:  Are you satisfied with her advice and

15  representation?

16       THE DEFENDANT:  Yes, I am.

17       THE COURT:  Okay.  Now, you have a copy of the

18  Information; is that correct?

19       THE DEFENDANT:  Yes.

20       THE COURT:  And I think you just indicated you've

21  read it and you've discussed it with Miss Crouse; right?

22       THE DEFENDANT:  Yes, Your Honor.

23       THE COURT:  And did she explain to you the maximum

24  possible penalties that would be involved upon a conviction of

25  the Information?

1           THE DEFENDANT:  Yes, she did, Your Honor.

2           THE COURT:  Now, the important distinction here is

3  the difference between proceeding by Information and the

4  difference between proceeding by a grand jury presentation.

5    If, in fact, the Information is not followed through with

6  today, the government certainly could present the case to a

7  grand jury and seek to obtain what's called an Indictment

8  against you.  A grand jury is composed of at least 16 people,

9  not more than 23.  In order for there to be an Indictment, at

10  least 12 of those people seated must find that, based upon

11  what they've heard in the proceedings, there is probable cause

12  to believe that a crime has been committed in order for them

13  to return an Indictment against you.

14    Do you basically understand that?

15           THE DEFENDANT:  Yes, I do.

16           THE COURT:  All right.  And if you do not wish to

17  waive your right to have the case proceed by Information --

18  excuse me.  If you do not wish to waive your right to have the

19  case presented by Indictment, a presentation to the grand jury

20  will occur and the case could proceed in that fashion.

21    Do you understand that?

22           THE DEFENDANT:  I do.

23           THE COURT:  Has anybody made any particular promises

24  or threats, other than what's contained in the understanding

25  you've reached with the government, to induce you or overbear

your will in terms of whether to proceed by Indictment or

Information?

        THE DEFENDANT:  No, Your Honor.

        THE COURT:  All right.  Now, whichever way you

proceed, either by Indictment or Information, there are

certain constitutional rights that you have, and nobody can

make you give those up.  Whether you proceed by Information or

Indictment, you have the right to enter a plea of not guilty

and to proceed to a jury trial or a bench trial.  Do you

understand that?

        THE DEFENDANT:  I do, Your Honor.

        THE COURT:  I understand that the way this is shaped

up that's not going to happen, but if it did and you said,

"Judge, I'm not guilty, and I want the government to prove the

case," then they would have to do that beyond a reasonable

doubt, and it would occur in this room with 12 jurors seated

to hear the evidence against you.  Do you understand that?

        THE DEFENDANT:  Yes, I do, Your Honor.

        THE COURT:  All right.  You have the right to be

represented by competent counsel, which Miss Crouse certainly

is.  What lawyers do often in criminal defense situations is:

they can make an opening statement; they can make a closing

argument; they could challenge whatever documents or exhibits

Miss Glatfelter wished to put forward.  But I think the most

important thing that criminal lawyers do in defending their

clients is that anybody that would testify against you, they would ask them questions under oath. We call that cross-examination.

Are you familiar with that process, generally?

THE DEFENDANT: I am.

THE COURT: Okay. If you thought there were witnesses that could provide helpful information or favorable testimony and you properly got them served with subpoenas, the Marshals would compel those people to show up at trial and testify. Do you understand that?

THE DEFENDANT: I do, Your Honor.

THE COURT: Okay. Everybody charged with an offense in the United States has two rights: One is that nobody can make you admit you committed a crime; and the second one is nobody could make you testify.

Since we're talking about a trial, let's go through the second one first.

We're not going to have a trial as this thing is formed, but if we did have a trial, Emily could not put you on the witness stand and ask you questions. The only way that would happen would be if you and Miss Crouse sat down and had a conversation and you knowingly, intelligently decided to give up your right not testify and you took the stand first; and only after your testimony could the government cross-examine you. Do you understand that?

1        THE DEFENDANT:  I do, Your Honor.

2        THE COURT:  Okay.  Now, the burden of proof in a

3   criminal case is beyond a reasonable doubt, which means that

4   the government has an obligation to prove each and every

5   material element of the offense charged beyond a reasonable

6   doubt.

7        In any kind of a case we have, whether it's a civil trial

8   or a criminal trial, any time the jury takes a break, and this

9   is throughout the course of the trial, I tell them a couple of

10  things.  I say, "You're not to form or express an opinion or

11  discuss the case with anyone until you've heard not only all

12  the evidence but also until you've heard the instructions of

13  law," which are typically given some before, some during, but,

14  most importantly, at the end of the case.

15       I tell them all that.  All right?

16       In a criminal case, I go a step further.  I say, "As a

17  matter of fact, unless and until you think the government has

18  proven the case, each element beyond a reasonable doubt, you

19  have to presume that Mr. Bullar is innocent unless the

20  government overcomes that presumption after you've all sat in

21  the back and talked about it."

22       Do you understand that?

23        THE DEFENDANT:  I do, Your Honor.

24        THE COURT:  Okay.  So those are the rights you have

25  whether you proceed by Information or by Indictment.

```
1        It's my understanding that you do wish to proceed by

2   Information; is that correct?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  And Candace, do you have the appropriate

5   paperwork?  Has it already been --

6            MS. CROUSE:  I believe Emily has the -- I have the

7   Information.  Is there a waiver?

8            THE COURT:  Do you have the waiver?

9            MS. GLATFELTER:  No.  I thought that -- my

10  misunderstanding.  I thought that the Court did the waiver.

11           THE COURT:  Okay.

12      Well, we can grab one; right?

13           COURTROOM DEPUTY:  Yeah, from somewhere.

14           THE COURT:  Yeah.  That's all right.

15           MS. GLATFELTER:  I apologize, Your Honor.  I would

16  have brought it in --

17           THE COURT:  No.  Let's blame it on Crum.  She's not

18  here.

19      Right, Mare?

20      If anybody is listening upstairs and you have a blank

21  form, you want to run it down?  That would be fine.

22      We've got one.  Never mind.

23      (The courtroom deputy handed the document to Ms. Crouse.)

24           COURTROOM DEPUTY:  It's full of information, if you

25  just want to sign.
```

1    THE COURT:  Candace, just take a moment and just

2  review that with Mr. Bullar before we ask questions about

3  that.

4    Thanks, Mary.  That's Crum's fault.

5    THE DEFENDANT:  So I just sign?

6    MS. CROUSE:  Just sign right here.

7    THE COURT:  Thank you.

8    And Candace, you have no objection to us filling in the

9  case number and all that after the conclusion of the

10  proceedings; is that correct?

11    MS. CROUSE:  That's correct, Your Honor.

12    THE COURT:  So I'll stay on you just for a minute.

13  You've had conversations with Mr. Bullar about this whole

14  situation; correct?

15    MS. CROUSE:  I have, Your Honor.

16    THE COURT:  Do you think that you have fully informed

17  him about his right to have the case presented to a grand jury

18  and whether or not it would make sense for him at this point

19  in time to proceed by Information?

20    MS. CROUSE:  Yes, Your Honor.

21    THE COURT:  Do you think you fully advised him of all

22  the facts and circumstances surrounding this entire process?

23    MS. CROUSE:  Yes, Your Honor, I have.

24    THE COURT:  Do you believe that he does wish to

25  proceed by Information?

1      MS. CROUSE:  Yes.

2      THE COURT:  Okay.

3   John, question to you now.  We've had a conversation about

4   the difference between proceeding by Information or by

5   Indictment.

6      And Emily, have I covered everything that I need to in

7   that regard, do you think?

8      MS. GLATFELTER:  Yes, Your Honor.

9      THE COURT:  What is your intent at this time?  Do you

10  wish to waive presentation to a grand jury and proceed by

11  Information, or do you wish to have the case sent to a grand

12  jury?

13     THE DEFENDANT:  I wish to --

14     THE COURT:  Proceed by Information?

15     THE DEFENDANT: -- proceed by Information, Your Honor.

16     THE COURT:  Okay.  To that end, I've been handed a

17  Waiver of Indictment.  It appears to have both your signature

18  and the counsels' signature and I've watched you guys sign it

19  in open court.  So I will accept the waiver of presentation to

20  Indictment.  I'll ask that we file that with the Court, and I

21  will accept the waiver.

22     Okay.  One of the things we talked about was whether it

23  was by Information or by Indictment.  You have the right to

24  enter a plea of not guilty and have the case proceed to trial,

25  or you have the right, of course, to enter a plea of guilty.

1       And what is your pleasure in that regard?

2       I'll ask your counsel first.

3       Ma'am?

4           MS. CROUSE:  Mr. Bullar will enter a plea of guilty

5   to both counts of the Information, Your Honor.

6           THE COURT:  Okay.

7       Is that correct, sir, you wish to enter a plea of guilty

8   to the first count, which is Wire Fraud, and the second count,

9   which is Money Laundering?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Okay.  Let me go through a couple of

12  things with you.

13      All right.  I misplaced -- all right.

14      Okay.  The potential penalty for a violation of -- for

15  conviction for Wire Fraud is up to 20 years in prison.  Do you

16  understand that?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  There is a potential fine of a quarter of

19  a million dollars or twice the determined loss or gain,

20  depending on which side of the coin you look at it, is also a

21  possibility.  Do you understand that?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  If there is any term of imprisonment

24  that's imposed in this case, it has to be followed by a term

25  of supervised release.  We'll discuss that in a little more

1 detail, but it could be up to three years. Do you understand

2 that?

3            THE DEFENDANT: Yes, Your Honor.

4            THE COURT: In any criminal case where there is a

5 conviction, whether by plea or by jury trial, there is a

6 one-hundred-dollar special assessment. As to the first count,

7 that would be a hundred dollars. Do you understand that?

8            THE DEFENDANT: Yes, Your Honor.

9            THE COURT: All right. Restitution, forfeiture and

10 all of those things are possibilities. Those are things that

11 will be determined as we move down the road in this process.

12 Do you understand that?

13            THE DEFENDANT: Yes, Your Honor.

14            THE COURT: As to Count Two, which is the Money

15 Laundering charge, which is 18 U.S.C. 1957, that particular

16 one is up to ten years. Do you understand that?

17            THE DEFENDANT: Yes, Your Honor.

18            THE COURT: There's a potential fine of a quarter of

19 a million dollars. Do you understand that?

20            THE DEFENDANT: I do, Your Honor.

21            THE COURT: And, again, it could be twice the loss,

22 twice the gain. Again, it's followed by a term of three

23 years' supervised release if there is a term of imprisonment

24 imposed. Do you understand that?

25            THE DEFENDANT: I do, Your Honor.

1          THE COURT:  Okay.  There is also a one-hundred-dollar

2    special assessment.  So it's 100 for each count in this case,

3    a total of $200, as well as the potential restitution and

4    forfeiture proceedings.  Do you understand all that?

5          THE DEFENDANT:  I do, Your Honor.

6          THE COURT:  Okay.  By statute, a person in my

7    position, depending on what would be contained in a

8    presentence investigation, could order these two sentences,

9    potential sentences, to be run concurrently, which means at

10   the same time, or, theoretically, they could be run

11   consecutively, which would be one after the other.  Do you

12   understand that?

13         THE DEFENDANT:  I do, Your Honor.

14         THE COURT:  Okay.

15     Would now be an appropriate time to discuss other

16   potential prosecutions, or should we do that later?

17         MS. GLATFELTER:  Whichever the Court desires.

18         THE COURT:  You want to do it now, Emily?

19         MS. GLATFELTER:  Sure.

20         THE COURT:  All right.

21         MS. GLATFELTER:  The Plea Agreement in this case,

22   which was signed by the defendant on August 1st, 2014 on page

23   7, also reflects that this is a global agreement between the

24   United States Attorney's Office, The Southern District of

25   Ohio, and also the Hamilton County Prosecutor's Office, which

a representative has signed the Plea Agreement on page 7.

And if you look at paragraph 15 on page 6, that paragraph provides more information about other prosecutions, and it says, "Other than the offenses to which the defendant has agreed to plead guilty, and with the exception of crimes of violence and crimes against children unknown to this Office or the Office of the Prosecuting Attorney of Hamilton County as of the date of this agreement," no other charges will be filed other than those that the defendant is pleading guilty to today.

THE COURT: Okay.

Understanding the possible penalties imposed -- that could be imposed in this case, and also understanding the fact that you have chosen to proceed by Information, I'll ask you: How do you wish to plead to the charges in Count One of the Indictment, guilty or not guilty?

THE DEFENDANT: Guilty, Your Honor.

THE COURT: As to Count Two, charges in Count Two, guilty or not guilty? How do you wish to plead?

THE DEFENDANT: Guilty, Your Honor.

THE COURT: All right. Now, we talked a little bit about what the possible sentences were, the maximum possible sentences which could be imposed by statute. Back in 1984, Congress passed an act called the Sentencing Reform Act. What that did was, it tried to -- well, it did put together a

uniform system for figuring out sentences in criminal cases across the federal statutes.

So what happens is, is when we complete this case this morning, at some point you're going to meet with somebody from the Probation Department. They are going to take a detailed history from you. They're going to ask you for information and facts involving the case. Your lawyer should be with you at any and all times you talk with them. They're also going to sit down with the government to get their take on the information. They're going to look at a number of things.

The Sentencing Guidelines are used to calculate an appropriate sentence in criminal cases. For example, in a drug case, they look at the amount of drugs, are there guns involved, you know, how many people are involved. In situations like this, Wire Fraud and Money Laundering, they will take a look at things like, perhaps, the number of victims, certainly the amount of money involved, the complexity of the scheme, and any other number of things that may be involved in terms of the calculation.

What happens is, at the end of the day they write a report. The report is called a presentence investigation. Before I ever see the report, a copy in draft form is sent to the lawyers on both sides. They sit down -- in this case, Miss Crouse with you, and Miss Glatfelter with whomever in her office -- and they try to figure out if the report is

satisfactory or if they have objections.

If they have objections to that report, then they can file formal objections to it and deal with the probation officer and try to resolve it. If they cannot resolve those in informal dealings with the probation officer, then those objections are carried over to when the final report comes to me. When we come back at the time of sentencing and if there are unresolved objections -- and I'll just throw one out. An example in a case like this might be the amount of loss, the amount of gain, something like that. If there is confusion about that, we may have to have an evidentiary hearing, which could take place at the same time of the sentencing or perhaps before the sentencing depending on how my conversation with the lawyers go about the complexity.

All right?

THE DEFENDANT: I understand, Your Honor.

THE COURT: Basically, somebody in your position standing in front of me entering a guilty plea, whether it was this kind of a case, a drug case, a gun case or anything, and said, "What's it look like?" I'd say, "I don't have a clue. I'm not going to have any idea until the presentence investigation comes back."

This case is slightly different, because in the plea arrangement itself there's discussions about some of those various calculations we talked about. As I look at the Wire

Fraud count, the parties are agreeing that the Base Offense

Level is a 7 because of the offense.  They are also agreeing

that there should be 18 levels added because the amount of

loss is somewhere between two and a half and seven million

dollars.  All right?

They are also agreeing there are more than ten victims but

less than 50, which adds a different calculation.

They're also saying there's other levels.  I think four

are added because of the violations of commodities law at the

time of the offense and because you were a commodity pool

operator.

They are suggesting a final calculation for an offense

level.  All right?

In the second count of the Indictment -- excuse me, the

Information, the Engaging in Monetary Transactions, the Money

Laundering, they are saying that the Base Offense Level is the

same from Count One.  They're saying that one level is added

because there is a violation of 18 U.S.C. 1957.

So the final offense level in that would actually be a 32.

Okay?

So what happens then is, they run what's called a Criminal

History.  They put a category on you.  I'm just going to take

a wild guess that this is probably your first offense, so

you're going to have a Criminal History of I, probably.

As a result of all that, there is a computation made by

the Probation Department.  In this case, the parties are suggesting that the final offense level range is somewhere between 87 and 108 months if, in fact, that Criminal History proves correct.  Okay?

Now, everybody agree with what I've said so far in terms of the recommendations?

Emily?

MS. GLATFELTER:  Yes, Your Honor.

THE COURT:  Candace?

MS. CROUSE:  Yes, Your Honor.

THE COURT:  Now, what you have to understand, John, is that is nonbinding on me.  That's a recommendation to me. What you also need to understand a little bit about me is: I've been doing this for eight years, and any time the lawyers have gotten together and made a recommendation like that to me, I've always followed it.  Okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  But I don't have to.  You have to understand that.

THE DEFENDANT:  I understand that, Your Honor.

THE COURT:  Okay.  Because this is a felony, once the conviction is finalized you're going to be what's called a prohibited person, which means there is going to be some other ramifications such as:  you're not going to be able to own, use or possess any type of firearm or dangerous ordnance;

there may also be certain things that come up in terms of maybe debarment from certain licenses you may have as a result of your investment business; there may be other things that come up.

Anytime in the future you're filling out a questionnaire which has that box on it "Have you ever been convicted of an offense that's punishable by a year or more in prison?" you're going to have to check that off as affirmative.

There may be other things that may come up down the road. There may be civil lawsuits, whatever. A lot of that is out of my control, but I just want you to be aware that there are other possible ramifications.

Do you understand all of that?

THE DEFENDANT: I do, Your Honor.

THE COURT: Candace, do you think you've gone over the panoply of what you think may possibly flow from this?

MS. CROUSE: We have, Your Honor.

THE COURT: Okay. Since there is a term of imprisonment that's contemplated by the arrangement which, in all likelihood, I will follow, it has to be followed by a term of supervised release. I've previously described and discussed with you that that term of supervised release is, in all likelihood, three years.

There's not a recommendation on that, is there? I didn't check.

1    MS. CROUSE:  A recommendation of supervised release?

2    THE COURT:  Right.

3    MS. CROUSE:  No, Your Honor.

4    THE COURT:  Okay.  So that's up to me.

5    MS. CROUSE:  Yes.

6    THE COURT:  Okay.

7    In any event, what will happen is, the rules for

8    supervised release are the same as they are for probation in

9    the Southern District, which means you'll sit down with an

10   officer after you're released, they'll go over these rules,

11   which include not committing any other federal, state or local

12   offenses.  There may be other things.  They will have the

13   ability to do things like do an alcohol or drug assessment to

14   see if there's anything going on.  Sometimes there's things

15   like gambling that occur in cases such as this.

16   Anyway, they'll have the ability to do a fairly detailed

17   look inside your head to make sure that everything is okay.

18   But if they come up with any recommendations, if they think

19   there's a drinking problem, a drug problem or a gambling

20   problem or anything like that, they are allowed to order

21   whatever further treatment or examinations they think are

22   appropriate.

23   But at the end of the day, John, you're going to be living

24   under somebody else's rules for that period of time.  Okay?

25   THE DEFENDANT:  I understand, Your Honor.

 1          THE COURT:  If you violate any of those rules and

 2    regulations, an officer will sit you down.  Sometimes they'll

 3    talk to you directly or talk to your lawyer and see if they

 4    can work it out if it's not a big deal.  But if it's something

 5    like a new criminal offense or something of a serious nature,

 6    they will often file a violation report, which means that

 7    you've got to come back in front of me.  We could do two

 8    things:  first, figure out if, in fact, you did violate any of

 9    the terms and conditions; and, second, if you did, what do I

10    do with you.

11        If it's a serious enough thing such as a new criminal

12    charge or a theft case, something like that, you could

13    theoretically go back to prison for up to the full term of

14    supervised release, which would be three years.  Okay?

15          THE DEFENDANT:  I understand, Your Honor.

16          THE COURT:  All right.

17        Give me just a second, guys.

18        (Pause in proceedings.)

19        Candace, I'm sure you discussed with your client how the

20    restitution may be figured and worked out in this situation.

21        But unless it's agreed upon by the lawyers, then there is

22    going to be some type of a hearing and I'll have to figure

23    that out myself.  There could be forfeiture claims as a result

24    of trying to track certain items of property that the

25    government feels are ill-gotten gains or the result of ill-

gotten gains, and there may be some tax liability which results from the IRS, if they're involved in this. I have no idea if they are or not.

In any event, a number of those things may have to transpire before you get a final resolution of the case. Okay?

THE DEFENDANT: I understand, Your Honor.

THE COURT: Emily, do you want to cover anything in the Plea Agreement that you think either needs to be repeated or amplified; or if there are significant terms you think I've left out, do you want to just put them on the record now?

MS. GLATFELTER: Your Honor, just two things that I'd like to go over and make sure that the record is clear.

Page 4, paragraph 9, there is "Obligations of the U.S. Attorney's Office." It says, "At the time of sentencing, the government will recommend a sentence within the stipulated final offense level range, that is, 87 to 108 assuming the defendant has a Criminal History Category of I."

That's a provision for the United States in terms of our recommendation, not the defendant, who remains free to request whatever sentence he deems appropriate.

THE COURT: So it's not a (c)(1)(C) type of situation?

MS. GLATFELTER: Correct.

THE COURT: It's just a pure --

1          MS. GLATFELTER:  Correct.

2          THE COURT:  Got it.  Thank you.

3          MS. GLATFELTER:  And then paragraph 11, which is the

4   Waiver of Appeal:  The defendant is waiving the right to

5   appeal the sentence imposed, including the right conferred by

6   18 U.S.C. 3742(a).  However, he reserves the right to appeal

7   the sentence if we appeal, the United States meaning, or if

8   the Court imposes an illegal sentence such as a sentence above

9   the statutory maximum.  And the appeal waiver is not construed

10  to bar a claim of ineffective assistance or prosecutorial

11  misconduct.

12         THE COURT:  So John, let me back up and correct what

13  was a misstatement on my part before.  So the situation is

14  that the government has agreed that as long as your Criminal

15  History Category is where they think it's going to check out,

16  that that does not bar you and your lawyer for asking for a

17  waiver type of outcome in the case.  Is that fair?

18         THE DEFENDANT:  I understand that, yes, sir.

19         THE COURT:  Emily, is there anything else?  Do we

20  cover the bit on the particular forfeiture obligations?

21         MS. GLATFELTER:  The forfeiture is a state

22  forfeiture, and they are going to handle the proceedings

23  related to that.  It's just that in the Plea Agreement the

24  defendant is agreeing to forfeit that.  I believe the parties

25  have agreed upon a specific loss figure and know the specific

restitution amount, so there shouldn't be any proceedings or related litigation regarding that as well.  So we've already exchanged numbers, and they know what the restitution number will be.

THE COURT:  The other thing which I started to talk about as I was going through the constitutional rights, John, I covered the first part but not the second part.  I had indicated that in a typical situation nobody can make you admit you committed an offense.  Because you guys are proceeding by Information, there's an agent seated next to Miss Glatfelter, and I assume that either he or Miss Glatfelter is going to read into the record a Statement of Facts.

After they read that Statement of Facts, I'm going to ask you if it's accurate in all ways.  If you say, "Yes, it is," then that means you are admitting you committed the offenses set forth in the Statement of Facts, which I anticipate will be both counts of the Information.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  And you're willing to give up all those rights we talked about and continue in the process; is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Other than what's contained in the

Plea Agreement and the representations made by Miss Glatfelter and what I've been discussing, did anybody make you any other promises or tell you the case would be treated a certain way in order to get you to plead guilty?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Okay.  Did anybody overbear your will and force you to sign this Plea Agreement?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Okay.  By the same token, other than the fact that apparently there were potential other prosecutions out there and perhaps potentially more counts than are contained in the Information, other than the fact that that prosecution possibility is out there and the government could seek to prosecute you to the fullest extent of the law, did anybody levy any kind of undue force, pressure or coercion on you such that they overbore your will and that this agreement is not voluntarily on your part?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Okay.

Candace, could you direct your client's attention to page -- I believe it's page 7 of the Plea Agreement?  I'm going to ask if that's his signature there.

MS. CROUSE:  We have it open, Your Honor.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And did you sign that because that is the

1    entire understanding that you believe you have reached with

2    the United States Attorney and its office?

3            THE DEFENDANT:  I did, Your Honor.

4            THE COURT:  Candace, I recognize your signature, so

5    does that mean you agree with that statement as well?

6            MS. CROUSE:  I do, Your Honor.

7            THE COURT:  Give me one second, guys.

8        (Pause in proceedings.)

9        The one thing which I don't think -- well, I think I

10   covered it as a practical matter, but as a technical legal

11   matter:  The presentence investigation is a starting point for

12   the decision on what the actual calculation would be, John.

13   And up until about five or six years ago, if the probation

14   officer that wrote the report had done the mathematical

15   calculation correctly and correctly considered the factors, I

16   would have been obligated to impose a sentence in that range.

17   They give a range on the low end and a range on the high end.

18       Since then, the Supreme Court has said that it's the

19   starting point for people in my position in terms of

20   considering a sentence.  I can consider other factors, which

21   are known as the 18 U.S.C. 3553 factors, take a look at those.

22   If I thought it was appropriate and could justify it with

23   facts in the record, I could actually impose a sentence

24   which was tougher or much more serious than the calculations

25   as long as I didn't go above the statutory maximum that Miss

Glatfelter spoke about earlier, and I could go below the

sentence if I thought it was appropriate, again if I could

justify it by facts in the record.

In any event, as I have explained to you, the starting

point is going to be what's in the Plea Agreement and then

what you and your lawyer tell me at the time of sentencing.

Okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.

Emily, how do you want to handle the Facts?  Are you going

to read it or is the agent?

MS. GLATFELTER:  The agent is.

THE COURT:  Okay.

Agent, you can work wherever you're more comfortable,

either seated at the table, or if you wish to stand perhaps

the podium is an easier place so you don't have to bend over.

Do you want the agent sworn, Candace?

MS. CROUSE:  That's not necessary, Your Honor.

THE COURT:  Okay.  Thanks.

Mary, anything else I need to do, though?

COURTROOM DEPUTY:  No, no.  You're good.

THE COURT:  Agent, if you could do me a favor and

state your full name and spell your last name so that Maryann

can take it down, and then proceed through the Statement of

Facts?

1          THE AGENT:  Gordon Amegboh, A-M-E-G-B-O-H.

2          THE COURT:  Thank you.

3          AGENT AMEGBOH:  Beginning in or about 2003 through

4    September of 2013, in the Southern District of Ohio and

5    elsewhere, the defendant, John R. Bullar, perpetrated a scheme

6    to defraud investors by soliciting millions of dollars under

7    false pretenses, failing to invest investors' funds as

8    promised, and misappropriating and converting investors' funds

9    to Bullar's own benefit without the knowledge or authorization

10   of the investors, using interstate wire communications to

11   execute the scheme to defraud.

12        Bullar resided and worked in the Southern District of

13   Ohio.  Bullar was the sole owner and operator of Executive

14   Management Advisors, LLC, which had its principal place of

15   business in Cincinnati, Ohio.  Bullar was also the sole owner

16   and operator of Priapus Group, LLC.

17        Bullar marketed himself as someone experienced in the

18   financial services industry and who was successful in

19   investing in commodity futures.  Since at least 1998, Bullar

20   offered investment opportunities to investors in the Southern

21   District of Ohio and elsewhere through his company, EMA.

22        To persuade individuals to invest with him, Bullar

23   frequently made numerous false representations.  For example,

24   Bullar told potential clients that he never had a losing

25   quarter.  Bullar also offered potential investors a false

sense of security by telling potential clients that he, himself, was the biggest investor in EMA. At times, Bullar made it seem as though he was doing a favor for investors by telling them that he would manage their funds even though it was below his minimum level of investment.

The majority of Bullar's investors were friends, family members and fellow church members. Bullar told his clients that he had invested their money in precious metals, gold, silver, bonds and foreign currency, and that he made money based on the volatility of the market regardless of whether the market was up or down.

Bullar told clients that he preferred to keep the number of investors small so that he could fly under the radar. Bullar also told clients that he had a computerized algorithm system that monitored the market for patterns and alerted him to potential losses. Bullar told investors that although he had been offered millions of dollars for the system, he would not sell it because he could make more money using the system rather than selling it.

These representations were false, however, because, in reality, Bullar had invested only a small amount of the money that he had received from clients, using the vast majority of the money to pay other investors and his own personal expenses.

To induce current clients to keep investing and, thus,

conceal his fraudulent investment scheme, Bullar provided
investors with quarterly statements purporting to show their
account balances.  These statements often showed substantial
gains over a short period of timing.  For example, Investor A
wrote checks to Bullar between March of 2013 and April 30th,
2013, totaling $181,533.99.  According to Investor A's
quarterly statement dated June 28th, 2013, Investor A's
account balance was $229,276.66, a gain of approximately 26
percent in less than three months.  The quarterly statements,
such as Investor A's, were false, showing positive account
balances and fictitious earnings when, in fact, the money had
not been invested as promised.

Although Bullar collected over $8.7 million from investors
between mid-2006 and September of 2013, only $580,500 was sent
to brokers for trading.  The remaining 8.1 million was never
invested at all.  The small fraction of investor money that
Bullar actually sent to brokers for trading failed to generate
profits, and the money was either lost via trading or later
withdrawn by Bullar.  Yet, based upon the fictitious earnings
reported in the fraudulent statements, the investors continued
to invest more money with Bullar.

In addition, investors actually paid taxes on the
fictitious earnings.  Bullar caused Forms 1099 to be issued to
investors for tax purposes, which reported the fictitious
gains.  Investors relied on these documents to file their tax

returns, and investors paid taxes on the fictitious gains reported to them.

Bullar furthered his scheme by creating an appearance of legitimacy.  For example, Bullar created an investment blog for his clients, *www.emafutures.com*, which he updated regularly, sharing various articles and reports about the market.  Bullar outfitted his home office, which investors frequented, with a television and three computer monitors to give investors the impression that he was constantly monitoring the market.

Bullar's home also gave investors the impression that he was a successful trading advisor.  His expansive five-bedroom, five-bathroom house had professional landscaping, which was paid for with investor funds.  Bullar also purchased an adjoining lot with investor money and used investor money to remodel the cabin on the lot, install a swimming pool and outdoor kitchen, and pay for professional landscaping on the lot.  Bullar further perpetuated his image as a successful advisor by entertaining groups of investors at his home, treating investors to lavish dinners and paying for some investors to take vacations with him.

It was further part of the scheme to defraud that from mid-2006 to September 2013, Bullar received over $8.7 million from investors.  Bullar received investor funds through interstate wire transfers and through mailings delivered by

the United States Postal Service.  The vast majority of these funds were never invested in anything.  Rather, the funds were paid to other investors in the form of principal payments and/or gains, or spent by Bullar to pay for personal expenses.

For example, Individuals D and E invested money with Bullar.  On or about September 26, 2011, Bullar obtained a 500,000-dollar wire transfer payment from Investor D.  A few days later, Bullar also obtained a $200,085.05 wire transfer payment from Investor E.  Both wire transfers were deposited into the EMA bank account at First Financial Bank.  Bullar was the sole signatory on the EMA account.  On November 30th, 2011, Bullar wire-transferred $300,000 of the funds from the EMA account to the checking account of Priapus Group, LLC, at First Financial Bank, which he controlled.  On or about the same day, Bullar then wire-transferred $297,948.52 of the funds from the Priapus Group, LLC account to Riverview Title Agency, Inc., for the purchase of the property adjoining his personal residence.

Besides using investor money to pay other investors, Bullar used the money to pay for the mortgage on his home, home renovations, the purchase of property adjoining his residence, a swimming pool, professional landscaping, outdoor entertaining spaces, vacations, country club dues, boats, jet skis, sports tickets, and vehicles, among other things.

Bullar's investment scheme involved more than 10 victims

but less than 50 victims.  The loss amount resulting from

Bullar's investment scheme exceeded $2,500,000 but was less

than $7 million.  At the time of the offense, Bullar was a

commodities trading advisor or commodity pool operator.

THE COURT:  All right.

Candace, can you direct your client's attention to page 10

of the Plea Agreement, which is the last page of the Statement

of Facts?

MS. CROUSE:  Yes, Your Honor.

THE COURT:  John, similar to the question I asked

about the Plea Agreement itself, this appears to contain your

signature; is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Did you sign this because what's

contained on that document and what the agent just read into

the record is true and accurate?

THE DEFENDANT:  I did, Your Honor.

THE COURT:  Is it wrong in any way I should know

about?

THE DEFENDANT:  No, sir.

THE COURT:  Does that mean you're offering to plead

guilty to the two counts as set forth in the Information

because you did, in fact, commit those offenses?

THE DEFENDANT:  Yes, Your Honor.

MS. CROUSE:  Your Honor, there was a couple of

1    clarifications that we wanted to make regarding the Statement

2    of Facts.  This is just for clarification; it really does

3    nothing to affect the plea here.

4         THE COURT:  Is there anything that needs to be noted

5    on the statement and initialed by everybody, or is it just --

6         MS. GLATFELTER:  No, Your Honor.  I think we had both

7    agreed to -- we just wanted to clarify two facts in the Plea

8    Agreement.

9         THE COURT:  That's fine.  I will note for the record

10   counsel alerted me to that fact before we started, and I just

11   forgot.

12        MS. GLATFELTER:  Sure.  The money that was used to

13   improve the property or the residence, the Bullars' residence,

14   was from a joint banking account.  Investor money was

15   deposited into a joint banking account that he shared with his

16   wife, and then that money was used to pay the mortgage or pay

17   for improvements on the property.  We wanted to clarify that.

18      The second thing was to verify that the property that was

19   purchased where it says "the adjoining property" -- or, I'm

20   sorry, "the property adjoining his personal residence," we're

21   talking about the property that has the cabin currently

22   located on that property.

23        THE COURT:  Am I correct in assuming this may have

24   some import down the road, but in terms of today's proceeding

25   just to state it is sufficient enough?

1        MS. CROUSE:  Yes, Your Honor.  It really does not

2   affect Mr. Bullar because he has relinquished all of his

3   rights in the home.  It's just for clarification because the

4   home that he lived in as referred to in the Statement of Facts

5   was not in his name, it was in his wife's name and his

6   mother's name.  So the -- Emily is correct that money from

7   investors was put into a joint bank account along with the

8   wife's money that she earned, and that money was used to pay

9   the mortgage on that home.

10      So just to be clear on, kind of, where investor funds

11  went, and investor funds were, in fact, used to purchase the

12  cabin on the -- and the adjoining lot, which is --

13       THE COURT:  There's nothing I'm going to be asked to

14  do today regarding any of that stuff?

15       MS. CROUSE:  No, Your Honor.

16       THE COURT:  All right.  Candace, do you believe that

17  I've adequately explained to your client his constitutional

18  rights, his choice of Indictment versus Information, and

19  adequately explained to him the Sentencing Guidelines and what

20  the possibilities are?

21       MS. CROUSE:  Yes, Your Honor.

22       THE COURT:  John, in light of all the conversations

23  we've had about your rights, about the various things I've

24  just spoken about, Indictment versus Information, the

25  Sentencing Guidelines, I'll ask you for the final time:  How

do you wish to plea to the charge as set forth in the first
count of the Information, which is the Wire Fraud charge,
18 U.S.C. 1343, guilty or not guilty?

      THE DEFENDANT:  Guilty, Your Honor.

      THE COURT:  In light of the same rights we've been
talking about, the same presentence investigation report we
talked about, the Sentencing Guidelines, the Plea Agreement,
I'll ask you:  How do you wish to plea to the charge set forth
in Count Two of the Information, which is the Engaging in
Monetary Transactions from Property Derived from Specified
Unlawful Activity, typically referred to as Money Laundering,
in violation of 18 U.S.C. 1957, guilty or not guilty?

      THE DEFENDANT:  Guilty, Your Honor.

      THE COURT:  Okay.

   Based upon my observation of the defendant in court today,
his appearance and the responsiveness that he has shown in
giving answers to the questions I've been asking him, I'm
satisfied on a number of points:

   First, when he knowingly, intelligently and voluntarily
gave up his right to have the case presented by way of grand
jury and chose to proceed by Information.

   And we will docket that as I previously said once the case
numbers are filled in.

   Also, he is in full possession of his faculties.  He is
not suffering from any apparent physical or mental illness

which affects his ability to understand the proceedings we're engaged in or the communication and contact he's had with counsel.

He is not under the influence of any kind of narcotics or alcohol today.

He does understand the proceedings in which we are all engaged, as well as the nature and the meaning of the charges as set forth in both counts of the Information.

We've reviewed extensively the potential consequences of his plea of guilty to the Information, and he is aware, obviously, of negotiations undertaken on his behalf which resulted in the Plea Agreement, which I have discussed with him.

Therefore, I find that he is fully competent and capable of entering an informed plea, that he has waived his right to proceed by Indictment, and he knowingly, intelligently and voluntarily did that.

The plea of guilty in this case is also a knowing and voluntary plea for each count supported by an independent basis in fact which contains each of the essential elements as set forth in the offense charged in both the first count and the second count of the Information, all of which occurred in the Southern District of Ohio.

Since it's not a (c)(1)(C), I can go ahead and accept the plea and make a finding of guilty; correct?

1          MS. CROUSE:  Correct, Your Honor.

2          THE COURT:  All right.  So I'll accept the plea and

3   make a finding of guilty.

4       The next step in the process is going to be that

5   presentence investigation that we have been talking about.

6   But before we adjourn for today, a couple of things.  I did

7   note that there were some issues in terms of some medications

8   and things like that.  Where does that stand now?  Are you

9   doing okay?

10          THE DEFENDANT:  I am, Your Honor.

11          THE COURT:  All right.  Is there anything in terms of

12   your own health, whether it's physical or mental, that I

13   should be concerned about?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  Okay.

16       Candace, you have had conversations.  Would you also agree

17   with that?

18          MS. CROUSE:  I agree, Your Honor.

19          THE COURT:  Emily, is there anything from the

20   government in regards to potential bond in this case, or may I

21   just go forward myself?

22          MS. GLATFELTER:  Your Honor, we don't have anything

23   to add in addition to the report issued by Pretrial because

24   the defendant came here voluntarily today, and he has been in

25   contact with his counsel while we have been negotiating this

1  Plea Agreement.  We are satisfied with the bond conditions

2  suggested by Pretrial.

3        THE COURT:  Okay.  And we'll have the appropriate

4  paperwork to fill out, I believe, in just a moment.

5     In any event, it's going to be the order of the Court that

6  you will be released on your own recognizance.  There are

7  going to be certain conditions that have to be followed.

8     Number one, you'll meet with Pretrial Services, and

9  they'll set up some kind of reporting schedule to check in and

10  see what's going on.

11    Number two, if you have any kind of contact with law

12  enforcement, even if it's something trivial, report that to

13  Pretrial Services first.  It's better if they find out from

14  you rather than from a computer printout.

15    If there is anything involving any medication needs or

16  anything like that, you'll have to follow the recommendation

17  of Pretrial.

18    And in order to ensure your safety and the safety of those

19  around you, if they ask for a mental health evaluation or a

20  specific treatment, then you'll have to follow that in the

21  interim.  Is that okay?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  Okay.  You have had a history of

24  sometimes, I believe, traveling to Mexico to places.  I

25  believe you have a passport still.  Do you have that?

1          THE DEFENDANT:  I do, Your Honor.

2          THE COURT:  Could we surrender that to the Clerk's

3    Office at this time?  They'll take care of that.

4       Obviously, John, you're not to take any steps to go around

5    that like trying to get a new passport or something like.

6          MS. CROUSE:  Your Honor, would you like me to

7    surrender it here or walk it to the Clerk's Office?

8          COURTROOM DEPUTY:  Clerk's Office.

9          MS. CROUSE:  Okay, Clerk's Office.  Will do.

10          THE COURT:  All right.  Is there anybody from

11   Pretrial here?

12          MS. COOKE:  Yes.

13          THE COURT:  Oh, yeah, in the back.  Anything else you

14   think I need to include at this time?

15          MS. COOKE:  No, not at this time, Your Honor.

16          THE COURT:  Okay.  Have you met with him before?

17          MS. COOKE:  I have met with him before, and I'll meet

18   with him after court.

19          THE COURT:  Okay.  Great.  In terms of processing, I

20   think he has to go to the Marshal Service to have all that

21   done, which takes whatever, but I think --

22       Mary, can he sign the bond papers first?

23          COURTROOM DEPUTY:  Yes.

24          THE COURT:  Okay.

25       And you'll walk him down to the U.S. Marshal Service for

1  that?

2          MS. CROUSE:  I will.

3          THE COURT:  Okay.  So I guess he goes there, and

4  then he goes down to Pretrial; correct?

5          MS. COOKE:  Correct, Your Honor.

6          THE COURT:  Okay.

7      Emily, is there anything else?

8          MS. GLATFELTER:  I would just like to recognize that

9  there are numerous victims who are investors here present in

10  the courtroom today, and I know that they are interested in

11  addressing the Court, either by written letter -- in writing

12  or speaking at sentencing.  So I just wanted Your Honor to

13  know that they are present here today in the courtroom.

14          THE COURT:  Okay.  And, obviously -- actually, if

15  they can get contact information perhaps from Pretrial as to

16  where to address anything they may want to put in writing,

17  that goes -- usually --

18      I mean, when they write me a letter, does it go to the

19  Clerk's Office, I guess?  How does that work, do you know?

20          COURTROOM DEPUTY:  Judges do it differently.  I think

21  that they should all go through Probation.

22          THE COURT:  Okay.  So any information that anyone has

23  in terms of what they think I should know regarding the

24  situation and they want to put it in writing, then they should

25  submit that to the Probation Department, and that will get

included in the presentence investigation.

And I suppose if they would like to speak at the time of sentencing, they should alert the United States so you have a handle on that?

MS. GLATFELTER: Yes. We'll take care of that. If they -- if it's easier to submit the letters, we can take those letters and put them in a package to Probation, too. So if it's confusing at all, we're happy to do that.

THE COURT: Sure.

(The Court privately confers with the courtroom deputy.)

THE COURT: Thank you very much.

Okay. Anything else that needs to be brought to my attention at this time?

MS. CROUSE: No, Your Honor. I think that's it.

THE COURT: Emily?

MS. CROUSE: You don't set your sentencing dates until after the presentence report is disclosed; right?

THE COURT: No. Actually, I don't set them anyway; Crum does.

MS. CROUSE: Okay.

THE COURT: Normally, it's six to eight weeks, something like that. I don't know if this will be faster or sooner. I have no idea. We'll see what happens. And I will be in contact -- depending on what's in the PSI and whether or not there is going to be the need for an evidentiary hearing

1    regarding things like loss, I will be in contact with both

2    lawyers between now and whenever to figure out the most

3    expeditious manner, so --

4        Emily, is there anything else?

5            MS. GLATFELTER:  No, Your Honor.  Thank you.

6            THE COURT:  Candace, anything else?

7            MS. CROUSE:  That's it.  Thank you, Your Honor.

8            THE COURT:  Any questions you need to ask me at this

9    point in time, John?

10           THE DEFENDANT:  No, Your Honor.

11           THE COURT:  Okay.  All right.

12       So we'll stand in recess.

13           COURTROOM DEPUTY:  All rise.  This court is now in

14   recess.

15           THE COURT:  Thanks, everybody.

16

17       (The proceedings concluded at 2:50 p.m.)

18

19                    C E R T I F I C A T E

20

21       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

22   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

23

24   S/MARYANN T. MAFFIA, RDR

25   Official Court Reporter